UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY, AND ALLSTATE FIRE & CASUALTY INSURANCE COMPANY, <br><br> Plaintiffs, <br><br> vs. <br><br> BUSINESS ART INC., ANDRII PRUSKYI, EAST COAST 17 CORP., DIANA KATUNINA, A2K NY CORP., UNIVERSAL ACCESSIBILITY INC., OLEKSII ANTONOV, OCEANCREST ENTERPRISES CORP., AND KATERYNA ANTONOVA, <br><br> Defendants. | C.A. No. |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

The Plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire & Casualty Insurance Company (collectively, "Allstate" and/or "Plaintiffs"), by their attorneys, King, Tilden, McEttrick, & Brink, P.C., allege as follows:

1

## I.   INTRODUCTION

1.      This case involves a scheme to defraud executed by a series of durable medical equipment ("DME") companies and their owners, including Business Art Inc. ("Business Art"), Andrii Pruskyi ("Pruskyi"), East Coast 17 Corp. ("East Coast 17"), Diana Katunina ("Katunina"), A2K NY Corp. ("A2K NY"), Universal Accessibility Inc. ("Universal Accessibility"), Oleksii Antonov ("Antonov"), Oceancrest Enterprises Corp. ("Oceancrest Enterprises"), and Kateryna Antonova ("Antonova") (collectively, the "Defendants"), who conspired to submit fraudulent No-Fault insurance charges for the provision of unlicensed and medically unnecessary DME items, including osteogenesis stimulators, positions seats, and powered pressure-reducing air mattresses, to Allstate claimants.

2.      The Defendants damaged Allstate by intentionally demanding and collecting payment on false insurance claims.

3.      Business Art, East Coast 17, A2K NY, Universal Accessibility, and Oceancrest Enterprises (collectively, the "DME Entity Defendants") made material misrepresentations in their respective licensure applications to the Department of Consumer and Worker Protection ("DCWP") to dispense DME, rendering their licenses null and void.

4.      At all times relevant, the DME Entity Defendants were prohibited from seeking New York No-Fault claims as they failed to comply with state and local licensure laws.

5.      Despite this prohibition, the Defendants dispensed DME to claimants as part of a fraudulent pre-determined treatment protocol that required prescriptions for all claimants regardless of medical need.

6.      The Defendants knew that the DME billed to Allstate by the DME Entity Defendants was medically unnecessary, ineffective, and excessive.

7.     In furtherance of this scheme, Pruskyi, Katunina, Antonov, and Antonova (collectively, the "DME Owner Defendants") secured a steady stream of prescriptions for DME through unlawful financial arrangements made between the DME Entity Defendants and John J. McGee, D.O. ("McGee") – their primary referrer – in violation of New York law.

8.     Numerous DME prescriptions were generated by McGee and his employees at the clinics that specifically cater to No-Fault patients located at:

i.     1 Cross Island Plaza, Suite 323, Rosedale, New York;

ii.    132 32nd Street, Suite 208, Brooklyn, New York;

iii.   1200 Waters Place, Suite 112, Bronx, New York;

iv.    1552 Dahill Road, Brooklyn, New York;

v.     1839 Pitkin Avenue, Brooklyn, New York ;

vi.    1975 Linden Boulevard, Suite 400, Elmont, New York;

vii.   2088 Flatbush Avenue, Brooklyn, New York;

viii.  2115 Surf Avenue, Brooklyn, New York; and

ix.    384 East 149th Street, Suite 504, Bronx, New York.

9.     Several of McGee's clinics have been implicated in fraud schemes in other actions filed in this District.[1]

10.    The vast majority of the prescriptions were unlawfully steered by McGee and/or his employees (e.g., Stanislav Leshchinskiy, N.P. ("Leshchinskiy"); Stella Amanze, N.P. ("Amanze"); and Yledede Mimi Cummings, N.P. ("Cummings")) (collectively referred to as the

---

[1] *See Liberty Mutual Ins. Co. et al v. BSD OS LLC et al.*, No. 1:25-cv-01889-FB-LKE (E.D.N.Y.); *Government Employees Ins. Co. et al. v. Harmony OS LLC et al.*, No. 1:25-cv-02702-JAM (E.D.N.Y.); *Allstate Ins. Co. v. Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance,* No. 2:22-cv-02424-JMA-LGD (E.D.N.Y.); *Gov. Empls. Ins. Co., v. McGee, D.O.,* No. 1:23-cv-07753-PKC-PK (E.D.N.Y.); *Allstate Ins. Co., v. Ilyaich*, No. 1:13-cv-05464-NG-LB (E.D.N.Y.); *State Farm Mut. Auto. Ins. Co. v. McGee*, No. 1:10-cv-03848-PKC-RML (E.D.N.Y.); and *Gov't Empls. Ins. Co. v. Clearcare Medical Supplies Inc.,* No. 1:25-cv-03365-BMC (E.D.N.Y.).

"Referring Providers") through his clinic—Beach Medical Rehabilitation P.C. ("Beach Medical Rehabilitation")—to the DME Entity Defendants to allow the Defendants to bill insurers, including Allstate.

11.    The Defendants enriched themselves at the expense of patients, as the scheme generated immense numbers of prescriptions for the DME Entity Defendants without regard for actual medical need.

12.    Overall, the DME Entity Defendants operated in violation of New York law by dispensing and billing for DME that was prescribed pursuant to unlawful referral arrangements, was medically unnecessary, and was dispensed without the requisite licenses.

13.    The Defendants' scheme was designed to exploit New York's No-Fault laws, which provide insurance coverage to persons ("claimants") involved in automobile accidents.

14.    New York is an ideal venue for this scheme because every claimant is eligible for at least $50,000.00 in coverage for medical expenses under New York's No-Fault laws.

15.    The No-Fault system allows claimants to assign their benefits to medical providers, who may then seek payment directly from the claimant's insurer.

16.    However, medical providers are not eligible to collect No-Fault payments if they fail, in any respect, to comply with applicable licensing laws.

17.    The Defendants submitted fraudulent bills to Allstate seeking No-Fault payments for DME.

18.    The DME Entity Defendants' bills are fraudulent as the DME that was purportedly dispensed by the DME Entity Defendants was (1) provided to Allstate Claimants even though the DME Entity Defendants were not lawfully licensed; (2) provided pursuant to unlawful referral and financial arrangements, (3) excessive and medically unnecessary, (4) rendered as part of a

4

predetermined treatment protocol, and/or (5) provided for the sole purpose of maximizing the DME Owner Defendants' profits rather than improving the condition of each patient.

19.     The DME Entity Defendants' misconduct violated applicable New York State and local licensing requirements and Allstate was damaged by the fraudulent No-Fault claims submitted by the Defendants.

20.     The success of the Defendants' scheme to defraud relied on the transmission to Allstate, through the U.S. Mail, of invoices, bills, and other No-Fault claim documents warranting the DME Entity Defendants eligibility to collect No-Fault payments under New York law.

21.     The Defendants knew that the DME Entity Defendants were ineligible to collect No-Fault payments, yet they still created statutory claim forms (i.e., NF-3 bills), which falsely certified the DME Entity Defendants' eligibility to collect No-Fault payments under New York law.

22.     Allstate reasonably relied on the facial validity of the records and bills mailed by the DME Entity Defendants—and the representations contained therein—when making payments on the DME Entity Defendants' No-Fault claims.

23.     By this Complaint, Allstate brings this action against the Defendants for: (a) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961, *et seq.*; (b) common-law fraud; and (c) unjust enrichment.

24.     This action seeks actual damages of more than $227,375.87, which represent No-Fault payments that Allstate was wrongfully induced to make to the DME Entity Defendants during the course of this scheme.

25.     Allstate also seeks a declaration pursuant to 28 U.S.C. § 2201 that it is not legally obligated to make any further payments to the DME Entity Defendants in connection with any No-Fault claims submitted to Allstate.

26.     All of the acts and omissions of the Defendants described throughout this Complaint were undertaken intentionally.

27.     The Defendants intentionally submitted bills to Allstate on behalf of the DME Entity Defendants knowing that none of the bills were lawfully compensable under prevailing New York law.

## II.    THE PARTIES

### A.    PLAINTIFFS

28.     Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire & Casualty Insurance Company are corporations duly organized and existing under the laws of the State of Illinois, having their principal place of business in Northbrook, Illinois.

29.     At all relevant times to the allegations contained in this Complaint, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire & Casualty Insurance Company were each authorized to conduct business in New York.

### B.    DEFENDANTS

#### 1.    Business Art Inc.

30.     Business Art is organized as a limited liability corporation under New York law.

31.     Business Art's principal place of business is located at 113 Abbey Court, Apartment 2, Brooklyn, New York.

32.     According to the records on file with the New York Department of State, Pruskyi is the sole shareholder, officer, and/or director of Business Art.

33.     Business Art and Pruskyi participated in the operation and management of the Beach Medical Rehabilitation enterprise during the relevant period.

34.     Business Art and Pruskyi involved McGee and his employees to make false and fraudulent referrals for DME in violation of New York law.

35.     Business Art billed for the provision of fraudulent DME in connection with Allstate claimants.

36.     At all times relevant, Business Art did not possess the requisite license required by the City of New York.

37.     Business Art's bills were fraudulent because they misrepresented material facts about the licensure of Business Art.

38.     Business Art's bills were also fraudulent because the DME was not medically necessary.

39.     Accordingly, Business Art was never eligible to collect No-Fault payments from Allstate under N.Y. Ins. Law § 5102.

**2.     Andrii Pruskyi**

40.     Pruskyi resides in and is a citizen of the State of New York.

41.     At all times relevant, Pruskyi has never been licensed to perform healthcare services in the State of New York.

42.     According to the records on file with the New York Department of State, Pruskyi is the sole shareholder, officer, and/or director of Business Art.

43.     Pruskyi participated in the operation and management of the Beach Medical Rehabilitation enterprise during the relevant period, and is therefore responsible for the fraudulent DME billed in connection with the Allstate claimants at issue in this Complaint.

### 3.     East Coast 17 LLC

44.     East Coast 17 is organized as a limited liability corporation under New York law.

45.     East Coast 17's principal place of business is located at 2160 East 17th Street, Second Floor, Brooklyn, New York.

46.     According to the records on file with the New York Department of State, Katunina is the sole shareholder, officer, and/or director of East Coast 17.

47.     East Coast 17 and Katunina participated in the operation and management of the Beach Medical Rehabilitation enterprise during the relevant period.

48.     East Coast 17 and Katunina involved McGee and his employees to make false and fraudulent referrals for DME in violation of New York law.

49.     East Coast 17 billed for the provision of fraudulent DME in connection with Allstate claimants.

50.     At all times relevant, East Coast 17 did not possess the requisite license required by the City of New York.

51.     East Coast 17's bills were fraudulent because they misrepresented material facts about the licensure of East Coast 17.

52.     East Coast 17's bills were also fraudulent because the DME was not medically necessary.

53.     Accordingly, East Coast 17 was never eligible to collect No-Fault payments from Allstate under N.Y. Ins. Law § 5102.

**4.    Diana Katunina**

54.    Katunina resides in and is a citizen of the State of New York.

55.    At all times relevant, Katunina has never been licensed to perform healthcare services in the State of New York.

56.    According to the records on file with the New York Department of State, Katunina is the sole shareholder, officer, and/or director of East Coast 17.

57.    Katunina participated in the operation and management of the Beach Medical Rehabilitation enterprise during the relevant period, and is therefore responsible for the fraudulent DME billed in connection with the Allstate claimants at issue in this Complaint.

**5.    A2K NY Corp.**

58.    A2K NY is organized as a limited liability corporation under New York law.

59.    A2K NY's principal place of business is located at 224 West 34th Street, Suite 500, New York, New York.

60.    According to the records on file with the New York Department of State, Antonov is the sole shareholder, officer, and/or director of A2K NY.

61.    A2K NY and Antonov participated in the operation and management of the Beach Medical Rehabilitation enterprise during the relevant period.

62.    A2K NY and Antonov involved McGee and his employees to make false and fraudulent referrals for DME in violation of New York law.

63.    A2K NY billed for the provision of fraudulent DME in connection with Allstate claimants.

64.    At all times relevant, A2K NY did not possess the requisite license required by the City of New York.

9

65.     A2K NY's bills were fraudulent because they misrepresented material facts about the licensure of A2K NY.

66.     A2K NY's bills were also fraudulent because the DME was not medically necessary.

67.     Accordingly, A2K NY was never eligible to collect No-Fault payments from Allstate under N.Y. Ins. Law § 5102.

### 6.     Universal Accessibility Inc.

68.     Universal Accessibility is organized as a limited liability corporation under New York law.

69.     Universal Accessibility's principal place of business is located at 3 East Evergreen Road, Suite 101, New City, New York.

70.     According to the records on file with the New York Department of State, Antonov is the sole shareholder, officer, and/or director of Universal Accessibility.

71.     Universal Accessibility and Antonov participated in the operation and management of the Beach Medical Rehabilitation enterprise during the relevant period.

72.     Universal Accessibility and Antonov involved McGee and his employees to make false and fraudulent referrals for DME in violation of New York law.

73.     Universal Accessibility billed for the provision of fraudulent DME in connection with Allstate claimants.

74.     At all times relevant, Universal Accessibility did not possess the requisite license required by the City of New York.

75.     Universal Accessibility's bills were fraudulent because they misrepresented material facts about the licensure of Universal Accessibility.

76. Universal Accessibility's bills were also fraudulent because the DME was not medically necessary.

77. Accordingly, Universal Accessibility was never eligible to collect No-Fault payments from Allstate under N.Y. Ins. Law § 5102.

### 7. Oleksii Antonov

78. Antonov resides in and is a citizen of the State of Florida.

79. At all times relevant, Antonov has never been licensed to perform healthcare services in the State of New York.

80. According to the records on file with the New York Department of State, Antonov is the sole shareholder, officer, and/or director of A2K NY and Universal Accessibility.

81. Antonov participated in the operation and management of the Beach Medical Rehabilitation enterprise during the relevant period and is therefore responsible for the fraudulent DME billed in connection with the Allstate claimants at issue in this Complaint.

### 8. Oceancrest Enterprises Corp.

82. Oceancrest Enterprises is organized as a limited liability corporation under New York law.

83. Oceancrest Enterprises' principal place of business is located at 1701 Avenue P, Brooklyn, New York.

84. According to the records on file with the New York Department of State, Antonova is the sole shareholder, officer, and/or director of Oceancrest Enterprises.

85. Oceancrest Enterprises and Antonova participated in the operation and management of the Beach Medical Rehabilitation enterprise during the relevant period.

86. Oceancrest Enterprises and Antonova involved McGee and his employees to make false and fraudulent referrals for DME in violation of New York law.

87. Oceancrest Enterprises billed for the provision of fraudulent DME in connection with Allstate claimants.

88. At all times relevant, Oceancrest Enterprises did not possess the requisite license required by the City of New York.

89. Oceancrest Enterprises' bills were fraudulent because they misrepresented material facts about the licensure of Oceancrest Enterprises.

90. Oceancrest Enterprises' bills were also fraudulent because the DME was not medically necessary.

91. Accordingly, Oceancrest Enterprises was never eligible to collect No-Fault payments from Allstate under N.Y. Ins. Law § 5102.

### 9.    Kateryna Antonova

92. Antonova resides in and is a citizen of the State of Florida.

93. At all times relevant, Antonova has never been licensed to perform healthcare services in the State of New York.

94. According to the records on file with the New York Department of State, Antonova is the sole shareholder, officer, and/or director of Oceancrest Enterprises.

95. Antonova participated in the operation and management of the Beach Medical Rehabilitation enterprise during the relevant period and is therefore responsible for the fraudulent DME billed in connection with the Allstate claimants at issue in this Complaint.

III.    **JURISDICTION AND VENUE**

96.    Subject matter jurisdiction over this action is conferred upon this Court by 28 U.S.C. §§ 1331 and 1332.

97.    Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

98.    Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) and (c) whereas the vast majority of the acts known to Allstate alleged herein were carried out within the Eastern District of New York.

99.    The DME Entity Defendants conducted business in the State of New York by submitting bills under New York's No-Fault laws for DME items that were purportedly provided to patients who lived in New York or who were covered by New York automobile insurance policies issued by Allstate.

100.    The Defendants have therefore engaged in purposeful activities in New York by conducting business in New York.

101.    The Defendants have also engaged in purposeful activities in New York by causing the DME Entity Defendants to initiate arbitration proceedings in New York against Allstate.

102.    The Defendants used New York arbitrations and state court litigation to monetize their fraud against Allstate in such a way to essentially finance their fraudulent practices with proceeds paid by Allstate.

103.    The Defendants pattern of submitting and adjudicating baseless and repetitive claims have themselves helped to perpetuate their RICO violations.

104.    Specifically, the Defendants routinely commence frivolous New York arbitrations and/or state court litigation after Allstate denies their claims to fraudulently obtain No-Fault benefits that are used to finance the RICO scheme.

105.    The Defendants' activities in and contact with New York were purposely sought and transacted to take advantage of the benefits available under the No-Fault laws.

106.    The allegations and causes of action asserted herein arise from the Defendants' conduct within the State of New York and their purposeful availment of New York's No-Fault insurance system, and therefore there is no question that there exists a substantial relationship between the transactions at issue, and Allstate's causes of action.

107.    Overall, the fraudulent scheme alleged herein has many ties to the State of New York, and the ends of justice are best served through this Court's exercise of jurisdiction over the Defendants.

## IV.    APPLICABLE NO-FAULT LAWS AND LICENSING STATUTES

### A.    NEW YORK'S NO-FAULT LAWS—GENERAL PROVISIONS

108.    Allstate underwrites automobile insurance in the State of New York.

109.    New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents ("claimants") have an efficient mechanism to pay reasonable fees for necessary healthcare services.

110.    Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law § 5101, et seq.), and the regulations promulgated pursuant thereto (11 NYCRR § 65, et seq.) (collectively, "the No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault benefits") to claimants.

111.    Under the New York No-Fault law, individuals are entitled to be compensated for "basic economic loss" resulting from injuries caused by the operation of a motor vehicle.

112.    "Basic economic loss" is defined to include "all necessary expenses" for medical services. N.Y. Ins. Law § 5102(a)(1); 11 N.Y.C.R.R. § 65-1.1.

113.    No-Fault benefits include up to $50,000.00 per Allstate claimant for reasonable expenses that are incurred for necessary healthcare goods and services.

B.    ELIGIBILITY REQUIREMENTS UNDER NEW YORK'S NO-FAULT LAWS

114.    Medical providers are not eligible to collect payment under New York's No-Fault laws if they fail to meet _**any**_ applicable New York State or local licensing requirements necessary to perform those services in New York.  *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).

115.    An insurer may withhold No-Fault payments to a medical provider when there is a willful and material failure by the provider to abide by licensing and incorporation statutes.  *State Farm Mut. Auto. Ins. Co. v. Mallela*, 827 N.E.2d 758 (N.Y. 2005); 11 N.Y.C.R.R. § 65-3.16(a)(12).

116.    Accordingly, if a professional healthcare service provider fails to meet any applicable licensing requirement necessary to perform a service, then the provider is not lawfully entitled to seek or collect No-Fault benefits under New York's No-Fault laws.

117.    As alleged herein, the DME Entity Defendants failed to comply with several laws and regulations when providing healthcare services to claimants during the course of this scheme; therefore, the DME Entity Defendants are not—and never were—eligible to seek or collect No-Fault benefits from Allstate.

C.      NEW YORK CITY DME LICENSURE REQUIREMENTS

118.    Section 20-425 of the New York City Administrative Code requires licensure of any New York City healthcare providers that dispense DME.

119.    Subchapter 25 of Title 20 of the New York City Administrative Code specifically requires DME dealers (including any business that involves selling, renting, repairing or adjusting DME) to obtain a Dealer in Products for the Disabled License from the New York City Department of Consumer and Worker Protection (hereinafter referred to as a "DCWP License").

120.    A DCWP License is required for all New York City DME dealers to lawfully provide DME to the disabled.[2]

121.    Section 20-426 of the New York City Administrative Code provides that it is "unlawful for any dealer to engage in the selling, renting, repairing, or servicing of, or making adjustments to, products for the disabled without a license."

122.    To obtain a DCWP license, a dealer must submit an application to the Commissioner of the Department of Consumer and Worker Protection that includes the identity of the applicant, the address of the DME dealer and other pertinent information concerning its officers and directors.

123.    The application contains the following fraud warning:

---

[2] "Disabled" means a person who has a physical or mental impairment resulting from anatomical or physiological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques. NYC Admin. Code §20-425.

**PENALTY FOR FALSE STATEMENTS:**

It is against the law to make a statement in this Application that you know is false. If you make a statement that you know is false, you may be punished.

Under Sections 210.45 and 175.30 of the New York Penal Law, you may be:
- fined up to $1000 and / or
- sent to jail for up to one year

Under Section 175.35 of the New York Penal Law, you may be punished if you:
- make a statement that you know is false and / or
- make the statement because you intend to mislead the Department of Consumer Affairs

Under Section 175.35 of the New York Penal Law, you may be:
- fined up to $5000 or
- fined an amount that is twice the amount of money you received by making the false statement and / or
- sent to jail for up to 4 years

The Department of Consumer Affairs may also punish you for making a false statement on this Application. These punishments may include:
- fines or penalties of up to $500 for each false statement
- permanent loss (revocation) of your license

124.    At no time were the DME Entity Defendants licensed by the DCWP to dispense DME and therefore ineligible for No-Fault reimbursement.

**D.    CLAIMING REIMBURSEMENT UNDER NEW YORK'S NO-FAULT LAWS**

125.    Claimants can assign their No-Fault benefits to third-parties.

126.    Under a duly executed assignment, a claimant's medical provider may submit claims directly to an insurance company and receive payment for necessary medical services rendered.

127.    Medical providers can submit No-Fault claims by using the claim form required by the DOI (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3 forms").

128.    NF-3 forms are important because they certify that the provider's request for payment is not materially false, misleading, or fraudulent. 11 N.Y.C.R.R. § 65.3-11(a); N.Y. Ins. Law § 403(d).

129.    Under New York law, medical providers must verify their NF-3 submissions subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime…

N.Y. Ins. Law § 403(d).

130.    Medical providers make material misrepresentations when they submit NF-3 forms that omit or misrepresent information about the provider's eligibility for payment under New York's No-Fault laws. These misrepresentations can take many forms, including false or misleading information about licensure and medical necessity.

131.    Therefore, the Defendants committed fraud by misrepresenting material facts about (a) the DME licensure, and (b) the medical necessity of the DME dispensed.

## V.    FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### A.    THE ASSOCIATION BETWEEN THE DME ENTITY DEFENDANTS

132.    Although the DME Entity Defendants appear to be distinct legal entities owned by separate individuals, the hallmarks of their fraud scheme are interchangeable.

133.    The association between the DME Entity Defendants is supported by the fact that each of the DME Entity Defendants utilized the same telephone number (i.e., (929) 743-3572) on their respective delivery receipts, which were submitted to Allstate.

134.    True and accurate images from these delivery receipts depicting the address and telephone number for each of the DME Entity Defendants is contained below.

| DME Entity | Owner | Sample Delivery Receipt |
|---|---|---|
| Business Art | Pruskyi | **Business Art**<br><br>113 Abbey Ct, Brooklyn, NY, 11229<br><br>Phone: +19297433572<br><br>Delivery Slip |
| East Coast 17 | Katunina | **EAST COAST 17 CORP**<br><br>2160 E 17th St, Brooklyn, NY, 11229<br><br>Phone: +19297433572<br><br>Delivery Slip |
| A2K NY | Antonov | **A2K NY CORP**<br><br>224 W 35 ST, New York, NY, 10001<br><br>Phone: +19297433572<br><br>Delivery Slip |
| Universal Accessibility | Antonov | **UNIVERSAL ACCESSIBILITY INC**<br><br>3 E Evergreen Rd, New City, NY, 10956<br><br>Phone: +119297433572<br><br>Delivery Slip |

| Oceancrest Enterprises | Antonova | OCEANCREST ENTERPRISES CORP. 1701 AVENUE P, BROOKLYN, NY 11229 Phone: +19297433572 Delivery Slip |
|---|---|---|

135. The use of a single telephone number to operate and manage each of the DME Entity Defendants, which purport to be five (5) separate and independent entities, would not be possible without the Defendants' active participation in the fraud scheme.

136. In addition to sharing a single telephone number, the DME Entity Defendants each received medically unnecessary prescriptions for the fraudulent DME that was purportedly issued pursuant to the predetermined treatment protocol.

137. For example, although a single prescription would purportedly be issued by a Referring Provider for multiple DME items, the items would inevitably be divided between the DME Entity Defendants and other DME distributors.

138. In certain instances, claimants such as D.J. (Claim No. 0767975295) and as D.H. (Claim No. 0770595279), were purportedly provided with DME from as many as 18 to 20 separate DME providers, including the DME Entity Defendants, respectively.

139. As such, throughout this scheme, Business Art was responsible for distributing osteogenesis stimulators; East Coast 17 Corp. and Oceancrest Enterprises were responsible for distributing positioning seats for persons with special orthopedic needs; and A2K NY and Universal Accessibility were responsible for distributing powered pressure-reducing air mattresses.

140.    By allocating referrals for DME items in this manner, each of the DME Entity Defendants were intentionally incorporated to bill insurers, including Allstate, nearly exclusively for one (1) specific type of DME.

141.    Accordingly, when a Referring Provider issued a prescription or referral for DME, Business Art submitted bills to Allstate for osteogenesis stimulators under the Healthcare Common Procedure Coding System ("HCPCS") code E0747; East Coast 17 and Oceancrest Enterprises submitted bills to Allstate for positioning seats for persons with special orthopedic needs under the HCPCS code T5001; and A2K NY and Universal Accessibility submitted bills to Allstate for powered pressure-reducing air mattresses under HCPCS code E0277.

142.    Notably, in two (2) instances, A2K NY also submitted bills to Allstate for infrared heating pad systems under HCPCS code E0221.

143.    In an effort to conceal the Defendants' fraudulent scheme, the Referring Providers routed DME referrals directly to the DME Entity Defendants, who then billed insurers, including Allstate, for the specific types of fraudulent DME items.

144.    This process not only removed claimants from the decision making process, but also limited the amount of billing that any one DME company, including the DME Entity Defendants, could submit.

145.    To further conceal the nature of this scheme, the DME Entity Defendants operated for short periods in sequential order to limit the amount of billing for each of the DME Entity Defendants.

146.    For example, the DME Entity Defendants operated in the following sequential manner:

      i.    Business Art submitted DME billing to Allstate between April 19, 2024, and August 21, 2024;

ii.  East Coast 17 submitted DME billing to Allstate between May 2, 2024, and February 19, 2025;

iii.  A2K NY submitted DME billing to Allstate between June 8, 2024, and November 14, 2024;

iv.  Universal Accessibility submitted DME billing to Allstate between November 22, 2024, and May 26, 2025; and

v.  Oceancrest Enterprises submitted DME billing to Allstate between April 1, 2025, to the present.

147.  Although the DME Entity Defendants were incorporated in either 2024 or 2025, Pruskyi, Katunina, and Antonov allowed Business Art, East Coast 17, and A2K NY to cease operating after less than one (1) year.

148.  Notably, Pruskyi, Katunina, and Antonov allowed Business Art's, East Coast 17's, and A2K NY's DCWP licenses to expire on March 15, 2025, respectively.

**B.  OVERVIEW OF THE DEFENDANTS' SCHEME TO DEFRAUD ALLSTATE**

149.  The Defendants conceived and implemented this complex fraud scheme in order to use the DME Entity Defendants as vehicles to bill Allstate and other insures in the State of New York for millions of dollars of No-Fault benefits, which the Defendants were never entitled to receive.

150.  As documented above, to maximize the amount of No-Fault benefits that the Defendants could receive, the DME Owner Defendants used the DME Entity Defendants in sequential fashion, wherein each DME Provider Defendant dispensed and billed almost exclusively for one (1) specific DME item.

151.  In order to perpetrate this scheme, the Defendants obtained prescriptions for the fraudulent DME items that were purportedly issued by the Referring Providers.

152. Notably, the Defendants (i) did not market or advertise the DME Entity Defendants to the general public; (ii) lacked any genuine retail or office locations; and (iii) operated without any legitimate efforts to obtain patients that might require DME or healthcare providers that might legitimately prescribe DME.

153. Rather, and upon information and belief, the Defendants entered into illegal financial relationships with the Referring Providers, who then prescribed large volumes of the same prescriptions (or purported prescriptions) to the DME Entity Defendants for the specifically selected fraudulent DME items.

154. In many instances, the purported prescriptions were forged documents that contained a duplicated or stamped signature from the Referring Provider.

155. In furtherance of this scheme, and to further increase the amount of money that the Defendants could obtain from Allstate, the Referring Providers frequently issued prescriptions for items that were generic and vague.

156. For example, the Referring Providers issued (or purportedly issued) generic prescriptions for positioning seats for persons with special orthopedic needs, which in turn allowed the DME Owner Defendants to unlawfully choose which variation of the item that could be provided to the Allstate claimants.

157. As a result, in numerous circumstances, the Defendants purported to provide Allstate's claimants with items that had high reimbursement rates under the applicable fee schedule.

158. In connection with the dispensing of these items, the Defendants submitted bills to Allstate seeking reimbursement for the fraudulent DME items while utilizing HCPCS codes that were not directly identified in the Referring Provider's prescription.

159.    Specifically, Oceancrest Enterprises and East Coast 17 billed Allstate for the fraudulent positioning seats using HCPCS code T5001.

160.    In certain instances, Oceancrest Enterprises and East Coast 17 submitted bills under this code for charges as high as $2,268.09 and $5,292.21, respectively, without documentation from the Referring Provider to justify the selection of this item.

161.    Notably, positioning seats are available for purchase to the general public at a fraction of the rate charged by both Oceancrest Enterprises and East Coast 17.

162.    Accordingly, after the Defendants obtained the vague and generic prescriptions for the fraudulent DME, the Defendants billed Allstate through each of the DME Entity Defendants for (i) fraudulent DME that was not reasonable nor medically necessary; (ii) fraudulent DME that was not based on valid prescriptions from licensed healthcare providers; and (iii) fraudulent DME that was otherwise not reimbursable.

C.    UNLICENSED PROVISION OF DME

163.    At all times relevant, Business Art, East Coast 17, A2K NY, Universal Accessibility, and Oceancrest Enterprises did not possess the necessary DME licensure required to bill No-Fault insurers, including Allstate.

164.    New York City's Administrative Code requires that DME orthopedic device suppliers obtain DCWP Licensure. *See* NYC Admin. Code § 20-425; 6 RCNY § 2-271.

165.    To obtain a DCWP license, a dealer must submit an application to the Commissioner of the Department of Consumer and Worker Protection that includes the identity of the applicant, the name of the business, the operating address of the business, the primary telephone number, and other pertinent information concerning the entity's officers and directors.

166.     The application contains the following affirmation and false statement warning:

**AFFIRMATION – Please read and sign below.**

I am authorized to complete and submit this application and all attachments (together, the "Application"). I have reviewed the entire Application. To the best of my knowledge, this Application is true, correct, and complete.

If any of the information in this Application changes, the applicant must inform the Department of Consumer Affairs of those changes. I also understand that the applicant must comply with all relevant laws and rules if granted a license to operate.

I understand that the Department of Consumer Affairs has not yet considered this Application. The applicant will not operate the business until receipt of an actual license document from the Department of Consumer Affairs or until / unless the Department of Consumer Affairs has given written permission to operate while this Application is pending. This affirmation shall be deemed executed in the City and State of New York and shall be governed by and construed in accordance with the laws of the State of New York (notwithstanding New York choice of law or conflict of law principles) and the laws of the United States.

I affirm that these statements are true and correct.

**PENALTY FOR FALSE STATEMENTS**: It is against the law to make a statement in this Application that you know is false. If you make a statement that you know is false, you may be punished.

Under Sections 210.45 and 175.30 of the New York Penal Law, you may be:
- fined up to $1000 and / or
- sent to jail for up to one year

Under Section 175.35 of the New York Penal Law, you may be punished if you:
- make a statement that you know is false and / or
- make the statement because you intend to mislead the Department of Consumer Affairs

Under Section 175.35 of the New York Penal Law, you may be:
- fined up to $5000 or
- fined an amount that is twice the amount of money you received by making the false statement and / or
- sent to jail for up to 4 years

The Department of Consumer Affairs may also punish you for making a false statement on this Application. These punishments may include:
- fines or penalties of up to $500 for each false statement
- permanent loss (revocation) of your license

By signing below, I understand and agree that:
- I am swearing or affirming that I have told the truth on this Application.

167.     Despite the false statement warning, the DME Owner Defendants each knowingly provided false information in their applications relating to the operating addresses for each of the DME Entity Defendants.

25

168. At all times relevant, the DME Owner Defendants have falsely identified their operating addresses.

169. Business Art falsely affirmed that its operating address was 113 Abbey Court, Apartment 2, Brooklyn, New York.

170. This address, however, is a residential address that is associated with three (3) additional DME providers, including Bloom A Inc., which is owned by the Defendant, Pruskyi.

171. East Coast 17 falsely affirmed that its operating address was 2160 East 17th Street, Apartment 2F, Brooklyn, New York.

172. This address, however, is a residential address that appears to be owned by two (2) individuals who are not associated with East Coast 17.

173. A2K NY falsely affirmed that its operating address was 224 West 35th Street, Suite 500, New York, New York.

174. This address, however, is a "PostScanMail" mailing and shipping center.

175. Universal Accessibility false affirmed that its operating address was 3 East Evergreen Road, Unit 101, New City, New York.

176. This address, however, is also a "PostScanMail" mailing and shipping center.

177. Oceancrest Enterprises falsely affirmed that its operating address was 1701 Avenue P, Brooklyn, New York.

178. This address, however, is a mixed-use property that is associated with at least ten (10) other businesses, including six (6) DME providers, two (2) diagnostic companies, and one (1) law firm.

179.   Likewise, in each application, the DME Owner Defendants provided false information in their applications relating to the primary telephone number for each of the DME Entity Defendants.

180.   Business Art falsely affirmed that its primary telephone number was (347) 593-9208.

181.   East Coast 17 falsely affirmed that its primary telephone number was (929) 694-4432.

182.   A2K NY falsely affirmed that its primary telephone number was (772) 888-7773.

183.   Universal Accessibility falsely affirmed that its primary telephone number was (772) 888-7773.

184.   Oceancrest Enterprises falsely affirmed that its primary telephone number was (772) 227-1110.

185.   In many instances, the telephone numbers listed in the DCWP license applications appear to have no connection to either the owner or the actual entity.

186.   As documented above, the DME Entity Defendants each utilized the same telephone number (i.e., (929) 743-3572), which was clearly displayed on each of the DME Entity Defendants' DME delivery receipts.

187.   Based on this evidence, it is clear that the DME Owner Defendants provided false information regarding their business addresses and telephone numbers to conceal their association and to induce the DCWP to issue licenses to them, which gave the DME Entity Defendants the appearance of separate and distinct legitimate businesses.

188.   Moreover, the DCWP licenses allowed the DME Entity Defendants the opportunity to submit fraudulent billing to insures in the State of New York, including Allstate.

189.     At all times relevant, the Defendants failed to comply with all significant statutory and regulatory requirements by operating as DME suppliers within the City of New York without valid DCWP licenses.

190.    A DME supplier that does not possess the DCWP Licensure is not lawfully permitted to provide supplies to patients located in New York City.

191.    Allstate was thus induced to pay DME Entity Defendants for unlicensed services in violation of New York Law.

192.    Accordingly, the DME Entity Defendants unlawfully dispensed DME in New York and were not eligible to submit No-Fault claims to Allstate whereas they were in violation of state and local licensure law.

**D.     THE DEFENDANTS' UNLAWFUL REFERRAL RELATIONSHIP WITH MCGEE**

193.    The Defendants' scheme to defraud required a high volume of facially valid prescriptions to permit the DME Entity Defendants to submit charges for DME.

194.    To maintain a steady flow of prescriptions or referrals for the fraudulent DME, the Defendants colluded with McGee, who specializes in No-Fault and had large available patient bases for the Defendants to take advantage of.

195.    McGee and/or his employees generated prescriptions for DME in accordance with the Defendants' pre-determined treatment protocol, regardless of whether the patients needed, or even wanted, the DME items.

196.    Upon information and belief, the Defendants paid kickbacks or other incentives to McGee and/or his employees in exchange for these unlawful prescriptions in violation of New York law.

197.    McGee and/or his employees funneled these prescriptions to the DME Entity Defendants, who in turn delivered the DME items to Allstate claimants.

198.    In doing so, McGee and the DME Entity Defendants dictated what DME items were dispensed to each claimant, thereby preventing the claimant from declining the DME at the time of the evaluation or selecting where the prescribed DME should be dispensed.

199.    These unlawful referral relationships were crucial to the success of the Defendants' scheme to defraud and resulted in false and fraudulent charges for medically unnecessary and expensive DME items, including the PCDs, TEJSDs, and osteogenesis stimulators.

### 1.    McGee's History of Fraudulent Activity

200.    McGee has a history of being accused of engaging in fraudulent activity under New York's No-Fault laws.

201.    In *Liberty Mutual Ins. Co. et al v. BSD OS LLC et al.*, No. 1:25-cv-01889-FB-LKE (E.D.N.Y.), Liberty Mutual sued six (6) DME providers and their respective owners, alleging that these defendants engaged in a comprehensive scheme to defraud for billing for unlicensed DME dispensed pursuant to unlawful prescriptions that were obtained by referring providers that included McGree and his employees.

202.    Likewise, in *Government Employees Ins. Co. et al. v. Harmony OS LLC et al.*, No. 1:25-cv-02702-JAM (E.D.N.Y.), GEICO sued nine (9) DME providers and their respective owners, wherein the defendants were alleged to have engaged in a similar comprehensive scheme to defraud for billing for unlicensed DME dispensed pursuant to unlawful prescriptions that were obtained by referring providers that included McGree and his employees.

203.    Prior to his involvement with DME companies, medical providers allegedly relied upon McGee, among others, and his entity, Yellowstone Medical Rehabilitation P.C., to provide

bogus referrals for computerized range of motion testing and muscle testing to further a conspiracy to defraud insurers. *See Allstate Ins. Co. v. Jeffrey S. Rauch, D.C. d/b/a Rego Park Healthcare Alliance*, No. 2:22-cv-02424-JMA-LGD (E.D.N.Y.).

204.   In exchange for these bogus referrals, it is alleged that McGee would receive a kickback/portion of the fraudulent proceeds from the No-Fault payments. *Id*.

205.   In furtherance of the conspiracy to defraud, it is alleged that McGee would manually perform the same testing that the claimants were being referred for. *Id*.

206.   The computerized range of motion testing and muscle testing that McGee made referrals for was allegedly never incorporated into the treatment plans by McGee. *Id*. McGee would allegedly offer identical treatment to each claimant regardless of their complaints, injuries, or want. *Id*.

207.   The *Rauch* lawsuit further alleges that McGee would submit identical letters of medical necessity to support the fraudulent treatment being referred. *Id*.

208.   McGee and his entity, Integrated Medical Rehabilitation and Diagnostics P.C., allegedly submitted hundreds of fraudulent charges to insurers for excessive and medically useless services in exchange for engaging in an illegal referral and kickbacks scheme. *See Gov't Empls. Ins. Co. v. McGee, D.O.*, No. 1:23-cv-07753-PKC-PK (E.D.N.Y.).

209.   McGee allegedly engaged in an illegal referral and kickback scheme to provide a steady stream of patients to his entity. *Id*.

210.   These kickbacks were allegedly performed to provide a client base for McGee and to fraudulently profit from the treatment performed. *Id*.

211.   Allegedly, McGee performed the same series of treatments on each claimant at issue as part of a pre-determined fraudulent treatment protocol. *Id*.

212.    McGee allegedly participated in a scheme to defraud insurers wherein he submitted fraudulent bills for treatment through the creation of illegally owned, incorporated, and licensed professional corporations, including the entities Queens-Brooklyn Medical Rehabilitation, P.C., Queens Brooklyn Jewish Medical Rehabilitation P.C., Queens-Roosevelt Medical Rehabilitation P.C., Woodward Medical Rehabilitation P.C., Advanced Medical Rehabilitation P.C., Integrated Medical Rehabilitation and Diagnostics P.C., Yellowstone Medical Rehabilitation P.C., and Beach Medical Rehabilitation P.C. *See Allstate Ins. Co. v. Ilyaich*, No. 1:13-cv-05464-NG-LB (E.D.N.Y.).

213.    It is alleged in the *Ilyaich* lawsuit that McGee engaged in fraudulent practices by creating illegally owned and fraudulently incorporated professional corporations that were used to submit fraudulent bills to insurance companies. *Id*.

214.    In exchange for these fraudulent practices, McGee allegedly received a portion of the proceeds and profits from the individuals in control of his entities. *Id*.

215.    Similarly, patients were allegedly referred for medically unnecessary therapy and diagnostic tests by McGee and his fraudulently incorporated entities, Advanced Medical Rehabilitation, P.C., Integrated Medical Rehabilitation and Diagnostics, P.C., Yellowstone Medical Rehabilitation, P.C., Queens-Brooklyn Medical Rehabilitation P.C., and Queens-Brooklyn Jewish Medical Rehabilitation, P.C. *See State Farm Mut. Auto. Ins. Co. v. McGee*, No. 1:10-cv-03848-PKC-RML (E.D.N.Y.).

216.    It is alleged in the *McGee* lawsuit that McGee falsely represented in corporate documents that he was the owner of the named clinics and, instead, that these clinics were secretly owned and controlled by others. *Id*.

217.    McGee allegedly engaged in a pre-determined treatment protocol to perform

31

medically unnecessary tests and services in collaboration with those secretly in control of his clinics. *Id*.

218.    McGee allegedly prescribed medically unnecessary drugs through his clinic—Beach Medical Rehabilitation—to be dispensed by Fresh Meadow Pharmacy Inc., Town Rx Inc, and Siki's Pharmacy Inc. *See LM Gen. Ins. Co. v. Fresh Meadow Pharmacy Inc.*, No. 1:24-cv-05373-OEM-VMS (E.D.N.Y.).

219.    It is alleged that McGee prescribed nearly identical medication for the claimants at issue. *Id*.

220.    McGee was the primary source of referrals for the defendants in *Fresh Meadow* as part of their scheme. *Id*.

221.    Likewise, McGee and his employees, including Leshchinskiy and Cummings, allegedly prescribed medically unnecessary DME that was provided and billed for through Clearcare Medical Supplies Inc.  *See Gov't Empls. Ins. Co. v. Clearcare Medical Supplies Inc.*, No. 1:25-cv-03365-BMC (E.D.N.Y.).

222.    It is alleged that these prescriptions, which were often duplicated or photocopied, were issued as a result of an unlawful financial arrangement between McGee and Andrii Yashnohor, the owner of Clearcare Medical Supplies Inc. *Id*.

223.    McGee and his employees were the primary source of the DME referrals for the defendants in *Clearcare Medical* as part of their scheme.  *Id*.

### E.    THE DME REFERRALS OBTAINED PURSUANT TO PREDETERMINED TREATMENT PROTOCOLS

224.     In addition to the Defendants' unlawful financial arrangements with McGee and his employees, the Defendants obtained prescriptions for the fraudulent DME pursuant to predetermined treatment protocols, which were designed to maximize the billing that the

Defendants – and others – could submit to insurance companies, including Allstate, rather than to treat or otherwise benefit their patients.

225. In nearly every instance, Allstate claimants that treated with the Referring Providers at Beach Medical Rehabilitation were subject to similar treatment, including identical prescriptions for the fraudulent DME.

226. The prescriptions for the fraudulent DME that were purportedly issued to the Allstate claimants were issued pursuant to predetermined treatment protocols set forth at each clinic, and not because the DME was medically necessary.

227. For example, virtually every claimant was prescribed a powered pressure-reducing air mattress after relatively low-speed and low-impact motor vehicle accidents.

228. In a legitimate setting, powered pressure-reducing air mattresses are not utilized to provide treatment to typical motor vehicle accidents patients when billed under HCPCS code E0277.

229. The Centers for Medicare & Medicaid Services ("CMS") has published guidance stating that powered pressure-reducing mattresses billed under E0277 are covered only when the mattress is placed directly on a hospital bed frame.

230. Here, the Allstate Claimants that were purportedly provided with this DME were not utilizing the equipment while treating at a hospital.

231. Rather, these items were prescribed by the Referring Providers at Beach Medical Rehabilitation and were purportedly dispensed by A2K NY and Universal Accessibility to maximize the Defendants' amount of billing per patient.

232. Similarly, in furtherance of this scheme, the Referring Providers prescribed osteogenesis stimulators, which were purportedly dispensed by Business Art.

233.    Osteogenesis stimulators are devices that apply electric current or ultrasound to the spine or a long bone (e.g., the femur) when a fusion or fracture failed to heal, or after a multilevel spinal fusion.

234.    The CMS has published guidance stating that osteogenesis stimulators billed under E0747 and E0760 are covered only when there is evidence of a fracture where healing has ceased for three (3) or more months.

235.    In a legitimate setting, osteogenesis simulators are not utilized to provide treatment to typical motor vehicle accident patients.

236.    Moreover, there is no scientific evidence that bone stimulators, like the osteogenesis stimulators purportedly provided by Business Art, help to treat patients with musculoskeletal injuries.

237.    These devices, however, were utilized by the Defendants, as the items could be acquired at a low cost, and subsequently billed to Allstate at a rate of $3,300.00 under HCPCS code E0747.

238.    As evidenced by the medical documentation that has been submitted to Allstate, virtually every claimant was prescribed the same DME pursuant to the predetermined treatment protocol by the Referring Providers at Beach Medical Rehabilitation.

239.    In a legitimate setting, the patient's course of treatment would be determined after reviewing the patient's subjective complaints and upon the completion of an evaluation.  In support of this course of treatment, the physician may, but generally does not, prescribe DME that might assist in the treatment of the patient's symptoms.

240.    In determining whether to prescribe DME to a patient, the physician would be required to evaluate multiple factors, including (i) whether the specific DME is likely to improve

34

the patient's symptoms; (ii) whether the specific DME could have any negative effects based on the patient's current physical condition and prior medical history; and (iii) whether the patient is likely to use the prescribed DME.

241. Moreover, the patient's age, height, weight, physical condition, location within the vehicle, and location of the impact would affect not only the patient's injuries but also whether DME would be appropriate.

242. As such, it is medically impossible for every Allstate claimant to receive nearly identical prescriptions for DME while treating at Beach Medical Rehabilitation.

243. Rather, these nearly identical prescriptions indicate that the DME referrals were based on predetermined treatment protocols rather than the individual patient's complaints and symptoms.

244. The medical records from Beach Medical Rehabilitation provide further evidence of the predetermined treatment protocol, wherein the Referring Providers utilized checkmark based prescriptions to prescribe DME.

245. In many cases, multiple DME items were selected when there was no legitimate nor documented reason for their selection.

246. In other instances, the Referring Providers utilized multiple prescriptions that included a single checkmark, which allowed the DME Entity Defendants to divide and bill for the prescribed DME items.

247. In furtherance of this scheme, many of the prescriptions that were purportedly issued by the Referring Providers contained photocopied, forged, or stamped signatures.

248. Prescriptions that were purportedly ordered by McGee have included the same photocopied, forged, or stamped signatures.

249.    A true and accurate image of the January 3, 2024, DME prescription for the claimant, J.D. (Claim No. 0740273016), is depicted below:



250.    A true and accurate image of the June 6, 2024, DME prescription for the claimant, A.G. (Claim No. 0756744140), is depicted below:



251.    A true and accurate image of the March 27, 2025, DME prescription for the claimant, O.M. (Claim No. 0745245829), is depicted below:



252.    A true and accurate image of the May 7, 2025, DME prescription for the claimant, D.C. (Claim No. 0791850043), is depicted below:



253.    Notably, the same photocopied, forged, or stamped signature for prescriptions that were purportedly ordered by McGee was previously identified in the matter *Allstate Ins. Co. et al. v. BSD OS LLC et al.*, Civil Action No.: 1:25-cv-06016-JRC (E.D.N.Y.) (hereinafter, the "Allstate DME Suit").

254.    A true and accurate image of the February 26, 2024, DME prescription for the claimant, M.A. (Claim No. 0763951282), from the Allstate DME Suit is depicted below:



255.    A true and accurate image of the January 21, 2025, DME prescription for the claimant, H.M. (Claim No. 055417824), from the Allstate DME Suit is depicted below:

256.    Prescriptions that were purportedly ordered by Leshchinskiy have identified two (2) photocopied, forged, or stamped signatures.  In instances in which Leshchinskiy purportedly prescribed powered pressure-reducing air mattresses, the following signature has appeared on the order form.

257.    A true and accurate image of the June 11, 2024, DME prescription for the claimant, J.P. (Claim No. 0758003537), is depicted below:



258.    A true and accurate image of the July 25, 2024, DME prescription for the claimant, T.S. (Claim No. 0764911889), is depicted below:



259.    A true and accurate image of the October 3, 2024, DME prescription for the claimant, S.D. (Claim No. 0765646887), is depicted below:



260.    A true and accurate image of the December 17, 2024, DME prescription for the claimant, V.M. (Claim No. 0778499952), is depicted below:



261.    In instances in which Leshchinskiy purportedly prescribed DME that included

orthopedic positioning seats, the following photocopied, forged, or stamped signature has appeared on the order form.

262.    A true and accurate image of the June 11, 2024, DME prescription for the claimant, J.P. (Claim No. 0758003537), is depicted below:



263.    A true and accurate image of the April 15, 2025, DME prescription for the claimant, P.O. (Claim No. 0789695035), is depicted below:



264.    A true and accurate image of the July 25, 2024, DME prescription for the claimant, T.S. (Claim No. 0764911889), is depicted below:



265.   A true and accurate image of the December 17, 2024, DME prescription for the claimant, V.M. (Claim No. 0778499952), is depicted below:



266.   Notably, these signatures are consistent with the photocopied, forged, or stamped signatures for Leshchinskiy that were previously identified in the Allstate DME Suit.

267.   Similarly, prescriptions that were purportedly ordered by Cummings have identified two (2) photocopied, forged, or stamped signatures.  In instances in which Cummings purportedly prescribed powered pressure-reducing air mattresses, the following signature has appeared on the order form.

268.   A true and accurate image of the May 23, 2024, DME prescription for the claimant, S.H. (Claim No. 0757172275), is depicted below:



269.    A true and accurate image of the July 3, 2024, DME prescription for the claimant,

S.T. (Claim No. 0761003318), is depicted below:



270.    A true and accurate image of the July 3, 2024, DME prescription for the claimant,

I.D. (Claim No. 0761003318), is depicted below:



271.    A true and accurate image of the July 30, 2024, DME prescription for the claimant,

N.B. (Claim No. 0762820686), is depicted below:



272.    In instances in which Cummings purportedly prescribed DME that included orthopedic positioning seats, the following photocopied, forged, or stamped signature has appeared on the order form.

273.    A true and accurate image of the November 29, 2023, DME prescription for the claimant, J.B. (Claim No. 0738281682), is depicted below:



274.    A true and accurate image of the April 29, 2024, DME prescription for the claimant, C.B. (Claim No. 0753085810), is depicted below:



275.    A true and accurate image of the May 23, 2024, DME prescription for the claimant, S.H. (Claim No. 075712275), is depicted below:



276.    A true and accurate image of the July 31, 2024, DME prescription for the claimant, N.B. (Claim No. 0762820686), is depicted below:



277.    Notably, these signatures are consistent with the photocopied, forged, or stamped signatures for Cummings that were previously identified in the Allstate DME Suit.

278.    At all times relevant, the Defendants falsely represented that DME was provided to Allstate claimants pursuant to valid prescriptions from healthcare providers for medically necessary DME, and that they were therefore eligible to collect No-Fault benefits.

279.    As evidenced by the documentation that has been submitted to Allstate – including the orders that contain photocopied, forged, or stamped signatures – the prescriptions from the Referring Providers at Beach Medical Rehabilitation were issued pursuant to predetermined treatment protocols for DME that was medically unnecessary and excessive.

280.    Virtually every patient that treated at Beach Medical Rehabilitation was provided with an initial examination that ultimately concluded with the Referring Provider prescribing multiple DME items.

281. The medical records that have been submitted to Allstate indicate that the DME items were not specifically ordered to address each patients' symptoms.

282. Rather, regardless of the nature of the alleged motor vehicle accident, the patient's age, the patient's physical condition, the patient's subjective complaints, and the patient's prior medical history, multiple DME items would be prescribed by the Referring Provider.

283. In furtherance of this scheme, the prescription would then be divided by the DME Entity Defendants, therefore allowing the Defendants to submit separate bills to Allstate that not only reduced the amount charged to Allstate, but also concealed the nature of their fraudulent scheme.

284. In keeping with the fact that the prescriptions for DME were not medically necessary and were prescribed pursuant to predetermined treatment protocols, the contemporaneous reports issued by the Referring Providers did not reference the prescribed DME items nor detailed the reasoning for the prescription or how the prescribed DME items would benefit the patient.

285. In the same manner, the Referring Providers did not reference or discuss the previously prescribed DME items in their follow-up examination reports.

286. The prescriptions for DME issued by the Referring Providers were not designed to aid their patients but were instead ordered to enrich the Defendants.

287. As the DME items were prescribed pursuant to predetermined treatment protocols in connection with unlawful financial arrangements, the Defendants, at all times relevant, were never eligible to collect No-Fault benefits.

**F.    THE IMPROPER DISTRIBUTION OF FRAUDULENT EQUIPMENT TO ALLSTATE CLAIMANTS BY THE ENTITY DEFENDANTS WITHOUT VALID PRESCRIPTIONS**

288.    As an initial matter, in order for a prescription to be valid, it must be actually issued by a licensed healthcare provider who has determined that such a prescription is medically necessary.

289.    In connection with this scheme, however, many of the prescriptions for the fraudulent DME that was purportedly issued by the Referring Providers were not valid prescriptions as they routinely (i) contained a photocopied, stamped, or forged signature of the Referring Provider, and (ii) were not referred or explained in any contemporaneous medical record.

290.    In specific instances, the purported prescriptions were undated and/or were issued on dates that the Referring Provider did not examine or treat the Allstate claimant.

291.    For example, the claimant, N.G. (Claim No. 0761050210), purportedly treated at Beach Medical Rehabilitation, where an initial evaluation was allegedly performed on July 25, 2024.

292.    Although the medical bill from Beach Medical Rehabilitation identifies Amanze as the treating provider, the corresponding DME prescriptions identify "John McGee" as the referring physician, despite containing Amanze's signature.

293.    True and accurate images of the July 25, 2024, DME referral forms are depicted below.

294.    Similarly, the claimant, A.L. (Claim No. 0776426835), purportedly treated at Beach Medical Rehabilitation, where an initial evaluation was allegedly performed on December 5, 2024.

295.    Although the medical bill from Beach Medical Rehabilitation identifies Amanze as the treating provider, the corresponding referral for a powered pressure-reducing air mattress identifies "Jon McGee" as the referring physician, despite containing Amanze's signature.

296.    A true and accurate image of the December 5, 2024, DME referral form is depicted below.

PRODUCT: Powered pres-redu air mattrs Powered pressure-reducing air mattress

I am prescribing the Powered pres-redu air mattrs Powered pressure-reducing air mattress for individuals on extended bedrest. It provides an effective sleep solution for patients with painful pressure ulcers. Also effectively distributes constant airflow throughout the body to help increase circulation, relieve pressure spots.

• Lumbar Pain    • Cervical Pain    • Knee Pain    • Wrist Pain    • Ankle Pain    • Shoulder Pain

OTHER _____

DURATION of TREATMENT: 10-minutes per Treatment (every 2-4 hours): 8-weeks

PHYSICIAN's INFORMATION:

Physician name: John Mcgee

Physician address: 2088 Flatbush Ave.

City: BKLYN State: NY Zip code: 11236 City: _____

Signature _____    Date 12/5/24

297.    Likewise, the claimant, K.S. (Claim No. 0768300337), purportedly treated at Beach Medical Rehabilitation, where an initial evaluation was allegedly performed on September 19, 2024.

298.    Although the medical bill from Beach Medical Rehabilitation identifies Arlene Huey, P.A. ("Huey") as the treating provider, the corresponding referral for a powered pressure-reducing air mattress identified "John McGee" as the referring physician, despite containing Huey's signature.

299.    A true and accurate image of the September 19, 2024, DME referral form is depicted below.

47

PHYSICIAN's INFORMATION:

Physician name: John Mcgee

Physician address: 2088 Flatbush Ave

City: BKLYN  State: NY  Zip code: 11236  City: _____

Signature _____    Date  9/19/24

300.    In addition, the DME Owner Defendants are not licensed healthcare providers, and are therefore not licensed to, nor permitted to, prescribe DME to patients.

301.    As such, the Defendants were not lawfully permitted to prescribe or otherwise determine what DME item(s) was medically necessary for each Allstate claimant.

302.    For the same reason, the DME Entity Defendants are unable to properly dispense DME items to an Allstate claimant without a valid prescription from a licensed healthcare provider that definitively identifies the medical necessity of the DME item(s) to be provided.

303.    Despite these requirements, as part of the fraudulent scheme, the Defendants improperly selected which DME items to provide to Allstate claimants without a valid prescription from a licensed healthcare provider, to the extent that the item was actually provided to the Allstate claimant.

304.    Moreover, the prescriptions purportedly issued by the Referring Physicians did not definitively identify the type of DME to be dispensed.

305.    For example, these prescriptions did not provide specific HCPCS codes or sufficient product details that would direct the Defendants to the unique type of DME item to be provided to patients.

306. In addition to failing to provide a specific type of DME item to be dispensed, the Defendants did not obtain any additional documentation from the Referring Providers that approved or otherwise acknowledged that the specific type of DME item – either by HCPCS code or product description – was medically necessary for each patient.

307. As such, the vague and generic prescriptions that were purportedly issued by the Referring Providers were intended to provide the Defendants with the ability to select which fraudulent DME items were to be dispensed based on their varying rate of reimbursement.

308. In a legitimate clinical setting, a DME supplier that received a prescription that did not contain a HCPCS code or sufficient product description to identify a specific DME item would contact the referring physician to request clarification on the specific item that was being requested, including the features and requirements to dispense the appropriate DME item prescribed to each patient.

309. Moreover, the DME supplier would request that the referring healthcare provider sign documentation to confirm that the specific DME item – identified by HCPCS code or detailed product description – was medically necessary for the patient.

310. The medical documentation that has been submitted to Allstate, however, indicates that the Defendants never sought instruction nor clarification from the Referring Providers.

311. Rather, these records indicate that the Defendants made their own determination with regard to each DME item, ultimately selecting DME items with higher reimbursement rates.

E. **THE FRAUDULENT BILLING SUBMITTED BY THE DEFENDANTS**

312. To support their fraudulent charges, the Defendants systematically submitted, or caused to be submitted, hundreds of NF-3 forms to Allstate through and in the names of the DME Entity Defendants, seeking reimbursement for the fraudulent DME.

313.    The NF-3 forms, prescriptions, and delivery receipts that the Defendants submitted, or caused to be submitted, were false and misleading, as they uniformly misrepresented to Allstate that the Defendants provided DME pursuant to prescriptions by licensed healthcare providers, which were reasonable and medically necessary, and were therefore entitled to receive No-Fault benefits.

314.    However, at all times relevant, the Defendants were ineligible to receive No-Fault benefits, as the DME that was purportedly dispensed by the DME Entity Defendants was (1) provided to Allstate Claimants even though the DME Entity Defendants were not lawfully licensed; (2) provided pursuant to unlawful referral and financial arrangements, (3) excessive and medically unnecessary, (4) rendered as part of a predetermined treatment protocol, and/or (5) provided for the sole purpose of maximizing the DME Owner Defendants' profits rather than improving the condition of each patient.

## VI.    SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY

315.    The Defendants created, prepared, and submitted (or caused to be created, prepared, and submitted) false medical documentation and intentionally violated the laws of the United States by devising, and intending to devise, schemes to defraud and obtain money and property by means of false and fraudulent pretenses in representations, and by placing, or causing to be placed, in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. § 1341 (mail fraud) for the purpose of executing, or attempting, such fraudulent schemes.

316.    Unless otherwise pled to the contrary, all documents, notes, reports, health insurance claim forms, medical diagnoses, referrals, prescriptions, letters of medical necessity,

delivery receipts, and NF-3's in connection with the insurance claims reference throughout this pleading traveled through the U.S. Mail.

317.    Every insurance claim detailed within, involved at least two uses of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claims settlement checks and the return of the cancelled settlement drafts to the financial institution(s) from which the draft(s) were drawn, as well as return of settlement draft duplicates to the insurance carrier's home office for filing.

318.    The Defendants used the U.S. Mail to further their fraudulent scheme and conduct the affairs of the Beach Medical Rehabilitation enterprise; they caused prescriptions, letters of medical necessity, delivery receipts, medical records, and NF-3 bills from the DME Entity Defendants to be mailed to Allstate and/or counsel for claimants, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

319.    The Defendants and/or persons working under their direction or control caused the DME Entity Defendants to falsely certify that they were, in all respects, eligible to collect No-Fault payments each time that they mailed a demand for payment (i.e., NF-3 bill or other invoice) to Allstate.

320.    The Defendants committed mail fraud because they used the U.S. Mail to submit No-Fault claims even though the DME Entity Defendants were not entitled to No-Fault payments.

321.    At all relevant times, the Defendants knew that claimants, insurance carriers, claimants' attorneys, other medical providers, and/or Allstate would use the U.S. Mail in connection with each of the DME Entity Defendants' fraudulent No-Fault claims, including issuing payments in reliance on the documents mailed by the DME Entity Defendants in support of the claims.

322.    Allstate estimates that the Defendants' scheme generated hundreds of mailings.  A representative sampling of mailings made in furtherance of the Beach Medical Rehabilitation enterprise are listed in the chart annexed at Exhibit 1 and incorporated herein by reference as if set forth in its entirety.

**VII.    SPECIFIC ALLEGATIONS OF FRAUDULENT CONCEALMENT AND MISREPRESENTATIONS MADE TO AND RELIED UPON BY ALLSTATE**

323.    The DME Entity Defendants falsely represented that they possessed the requisite DCWP license each time they submitted a claim to Allstate.

324.    Each letter of medical necessity submitted by the DME Entity Defendants falsely attested to the medical necessity of the DME devices.

325.    At all times relevant during the operation of the DME Entity Defendants, to induce Allstate to promptly pay charges for DME purportedly provided to claimants by the DME Entity Defendants, the Defendants caused the DME Entity Defendants to falsely certify that they were, in all respects, eligible to be reimbursed under New York's No-Fault laws.

326.    The Defendants concealed facts regarding the licensure of the DME Entity Defendants, which prevented Allstate from discovering that the DME Entity Defendants were ineligible for No-Fault payments.

327.    The Defendants also misrepresented material facts concerning the medical necessity of each DME, including the osteogenesis stimulators, positioning seats, and powered-pressure reducing air mattresses.

328.    The truth about the DME Entity Defendants licensure is not readily evident within the four corners of the documents submitted to Allstate by the Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim at issue in this matter.

329.    Claims under New York's No-Fault laws can only be submitted, and reimbursed, for services or products that were provided in accord with all applicable New York state licensing requirements.

330.    Thus, every time the Defendants (along with those individuals working under their control) caused the DME Entity Defendants to submit No-Fault claims to Allstate, the Defendants (and those individuals working under their control) necessarily certified that the DME Entity Defendants were, in all respects, eligible to be reimbursed under New York's No-Fault laws.

331.    The Defendants submitted numerous documents in furtherance of its efforts to conceal their fraud, including prescriptions, letters of medical necessity, delivery receipts, and NF-3's.

332.    The full extent of the Defendants' misconduct was not, and could not have been, known to Allstate until it commenced this action.

## VIII.    ALLSTATE'S JUSTIFIABLE RELIANCE

333.    Each claim submitted to Allstate by (or on behalf of) the Defendants was verified pursuant to Insurance Law § 403.

334.    To induce Allstate to promptly pay the DME Entity Defendants, the Defendants submitted NF-3 forms certifying that Business Art, East Coast 17, A2K, Universal Accessibility, and Oceancrest Enterprises were eligible to be reimbursed.

335.    Further, to induce Allstate to promptly pay the fraudulent charges for DME purportedly provided to Allstate claimants, the Defendants hired attorneys and law firms to pursue collection of the fraudulent charges from Allstate. These attorneys and law firms routinely file time-consuming and expensive lawsuits and arbitration matters against Allstate in the event that the DME Entity Defendants charges are not promptly paid in full.

336.    Allstate is under statutory and contractual obligations to promptly and fairly process claims within thirty (30) days.  The facially valid documents submitted to Allstate by the Defendants in support of the fraudulent charges, combined with the material misrepresentations described above, were designed to, and did, cause Allstate to justifiably rely on them.

337.    The Defendants concealed from Allstate the truth regarding the DME Entity Defendants' reimbursement eligibility.

338.    In reasonable reliance on these misrepresentations, Allstate paid money to the DME Entity Defendants to its detriment.

339.    Allstate would not have paid these monies had the Defendants provided true and accurate information about the DME Entity Defendants' reimbursement eligibility, including billing for (i) DME that was dispensed by an unlicensed entity; (ii) DME that was dispensed based upon forged and/or altered prescriptions; (iii) DME that was dispensed pursuant to an unlawful referral and illegal kickback scheme; (iv) DME items that were not medically necessary; and (v) services that failed to comply with state and local licensure laws.

340.    As a result, Allstate was caused to make No-Fault payments totaling over $227,375.87 to the DME Entity Defendants. *See* Exhibits 2-6.

341.    Allstate made payments to the Defendants in reasonable reliance on the documents and representations submitted by the Defendants in support of their No-Fault claims, including the (false) warranties that the DME Entity Defendants were eligible for payment under New York's No-Fault laws.

## IX.    <u>DAMAGES</u>

342.    The Defendants' pattern of fraudulent conduct injured Allstate in its business and property by reason of the aforesaid violations of state and federal law. Although it is not necessary

for Allstate to calculate damages with specificity at this stage in the litigation (whereas Allstate's damages continue to accrue), Allstate's injury includes, but is not limited to, compensatory damages for:

a.      Payments made to Business Art Inc. in excess of $99,225.82, the exact amount to be determined at trial. The chart annexed at Exhibit 2 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Business Art Inc. in connection with No-Fault benefit claims determined to be fraudulent as of the filing of this Complaint.

b.      Payments made to East Coast 17 Corp. in excess of $22,887.21, the exact amount to be determined at trial. The chart annexed at Exhibit 3 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to East Coast 17 Corp. in connection with No-Fault benefit claims determined to be fraudulent as of the filing of this Complaint.

c.      Payments made to A2K NY Corp. in excess of $80,658.74, the exact amount to be determined at trial. The chart annexed at Exhibit 4 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to A2K NY Corp. in connection with No-Fault benefit claims determined to be fraudulent as of the filing of this Complaint.

d.      Payments made to Universal Accessibility Inc. in excess of $23,092.04, the exact amount to be determined at trial. The chart annexed at Exhibit 5 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Universal Accessibility Inc. in connection with No-Fault benefit claims determined to be fraudulent as of the filing of this Complaint.

e.      Payments made to Oceancrest Enterprises Corp. in excess of $1,512.06, the exact amount to be determined at trial. The chart annexed at Exhibit 6 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Oceancrest Enterprises Corp. in connection with No-Fault benefit claims determined to be fraudulent as of the filing of this Complaint.

## X.    CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### BEACH MEDICAL REHABILITATION P.C. ENTERPRISE
**(Against Business Art Inc., Andrii Pruskyi, East Coast 17 Corp., Diana Katunina, A2K NY Corp., Universal Accessibility Inc., Oleksii Antonov, Oceancrest Enterprises Corp., and Kateryna Antonova)**

343.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-342 as if set forth fully herein.

344.    In furtherance of their operation and management of Beach Medical Rehabilitation P.C. ("Beach Medical Rehabilitation"), the Defendants, Business Art Inc., Andrii Pruskyi, East Coast 17 Corp., Diana Katunina, A2K NY Corp., Universal Accessibility Inc., Oleksii Antonov, Oceancrest Enterprises Corp., and Kateryna Antonova (collectively, "Count I Defendants"), intentionally prepared and mailed (or caused to be prepared and mailed) false medical documentation in connection with Allstate insurance claims in furtherance of their scheme to defraud.

345.    The Count I Defendants employed one or more mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 1.

346.    Among other things, NF-3 forms, prescriptions, letters of medical necessity, delivery receipts, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

347.    For example, in support of the charge for the pressured reducing air mattress that was purportedly provided to the claimant J.D. (Claim No. 0740273016), A2K NY Corp. submitted a copy of the Physician's Prescription from McGee.

348.    A true and accurate image of the Physician's Prescription form is depicted below.

# Physician's Prescription

**PATIENT INFORMATION:**

Patient Name: █████████████████

Phone: ████████████

Date of Birth: ████████ Date of Incident 12/20/23

Patient Address: ████████████████

City: ████████ State: ████ Zip Code: ████

Diagnosis:_____

ICD 10 Code:_____

Symptoms:_____

Limitation:_____

**PRODUCT:** Powered pres-redu air mattrs Powered pressure-reducing air mattress

I am prescribing the Powered pres-redu air mattrs Powered pressure-reducing air mattress for individuals on extended bedrest. It provides an effective sleep solution for patients with painful pressure ulcers. Also effectively distributes constant airflow throughout the body to help increase circulation, relieve pressure spots.

• Lumbar Pain    • Cervical Pain    • Knee Pain    • Wrist Pain    • Ankle Pain    • Shoulder Pain

OTHER _____

**DURATION of TREATMENT:** 10-minutes per Treatment (every 2-4 hours): 8-weeks

**PHYSICIAN's INFORMATION:**

Physician name:_____

Physician address:_____

City:_____ State_____ Zip code_____ City:_____

John McGee DO
2115 Surf Ave
Brooklyn, NY 11224
718.719.5070
NPI#619998184/NYSLic#165086
Tax ID 201428015

Signature _____ JL Mc___ DO _____        Date 03/20/24

349.    Likewise, a true and accurate image of the corresponding bill that was submitted to the Plaintiffs by A2K NY Corp is depicted below.

NEW YORK MOTOR VEHICLE NO-FAULT INSURANCE LAW
**VERIFICATION OF TREATMENT BY ATTENDING PHYSICIAN OR OTHER PROVIDER OF HEALTH SERVICE**
(This form is _not_ for verification of hospital treatment )

| NAME AND ADDRESS OF INSURER OR SELF-INSURER* **ALLSTATE INSURANCE COMPANY** P.O.BOX 2874, CLINTON, IA, 52733 | NAME, ADDRESS, AND PHONE NUMBER OF INSURER'S CLAIMS REPRESENTATIVE* |
|---|---|

| DATE 06/20/2024 | POLICYHOLDER | POLICY NUMBER 978476802 | DATE OF ACCIDENT 20 Dec 2023 | CLAIM NUMBER IWN7168 |
|---|---|---|---|---|

| PROVIDER'S NAME AND ADDRESS* **A2K NY Corp** 2626 East 14th Street, Suite 201, Brooklyn, NY, 11235 |
|---|

KINDLY COMPLETE AND SUBMIT THIS FORM AS SOON AS POSSIBLE. **PLEASE NOTE, THIS COMPLETED FORM MUST BE SUBMITTED TO THE INSURER AS SOON AS REASONABLY POSSIBLE BUT NO LATER THAN 45 DAYS AFTER THE TREATMENT DATE, DEPENDING UPON THE POLICY ENDORSEMENT IN EFFECT AT THE TIME OF THE ACCIDENT,** IF YOU ARE UNSURE OF THE APPLICABLE TIME REQUIREMENT, KINDLY CONTACT THE CLAIMS REPRESENTATIVE TO DETERMINE WHICH DEADLINE IS APPLICABLE TO THIS CLAIM.

IF YOU HAVE PREVIOUSLY SUBMITTED AN EARLIER REPORT ON THIS ACCIDENT, YOU NEED ONLY NOTE ANY CHANGES FROM THE INFORMATION PREVIOUSLY FURNISHED AND ADDITIONAL CHARGES.

1. PATIENT'S NAME AND ADDRESS

2. DATE OF BIRTH   3. SEX   4. OCCUPATION (IF KNOWN)

5. DIAGNOSIS AND CONCURRENT CONDITIONS
M54.50 Low back pain (Unspecified),

6. WHEN DID SYMPTOMS FIRST APPEAR?
DATE:   20 Dec 2023

7. WHEN DID PATIENT FIRST CONSULT YOU FOR THIS CONDITION?   DATE: _____

8. HAS PATIENT EVER HAD SAME OR SIMILAR CONDITION?
YES [ ]   NO [ x ]   IF YES, state when and describe:

9. IS CONDITION SOLELY A RESULT OF THIS AUTOMOBILE ACCIDENT?
YES [ x ]   NO [ ]   IF "NO", explain:

10. IS CONDITION DUE TO INJURY ARISING OUT OF PATIENT'S EMPLOYMENT?
YES [ ]   NO [ x ]

11. WILL INJURY RESULT IN SIGNIFICANT DISFIGUREMENT OR PERMANENT DISABILITY?
YES [ ]   NO [ ]   NOT DETERMINABLE AT THIS TIME [ x ]
IF "YES", describe:

12. PATIENT WAS DISABLED (UNABLE TO WORK)
FROM: _____   THROUGH: _____

13. IF STILL DISABLED THE PATIENT SHOULD BE ABLE TO RETURN TO WORK ON:
_____ (DATE)

CONTINUE ON PAGE 2

NYS FORM NF-3 (Rev 1/2004)
Page 1 of 3

350.    Policies of insurance were delivered to insureds through the U.S. Mail.

351.    Payments made by Allstate to the DME Entity Defendants were delivered through the U.S. Mail.

352.    As documented above, the Count I Defendants repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms to Allstate related to services that were purportedly performed by the DME Entity Defendants for the purpose of collecting payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

353.    As a result of, and in reasonable reliance upon, the mailing of these materially false representations, Allstate, by its agents and employees, issued drafts to the DME Entity Defendants, for the benefit of one or more of the Count I Defendants, that would not otherwise have been paid.

354.    The Count I Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a long period of time, thus enabling the Count I Defendants to continue without being detected.

355.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

356.    By creating and then mailing to Allstate (or directing the creation and subsequent mailing to Allstate) of numerous fraudulent documents in an ongoing scheme, the Count I Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

357.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to the DME Entity Defendants for the benefit of the Count I Defendants.

358.    Allstate is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

359.    Beach Medical Rehabilitation constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

360.    The Count I Defendants associated with the foregoing enterprise and participated—both directly and indirectly—in the conduct of the Beach Medical Rehabilitation enterprise through a pattern of racketeering activities.

361.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I Defendants' conduct.

362.    The Count I Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

363.    By virtue of the Count I Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### BEACH MEDICAL REHABILITATION P.C. ENTERPRISE
**(Against Business Art Inc., Andrii Pruskyi, East Coast 17 Corp., Diana Katunina, A2K NY Corp., Universal Accessibility Inc., Oleksii Antonov, Oceancrest Enterprises Corp., and Kateryna Antonova)**

364.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-342 as if set forth fully herein.

365.    Throughout their participation in the operation and management of Beach Medical Rehabilitation P.C. ("Beach Medical Rehabilitation"), the Defendants, Business Art Inc., Andrii

Pruskyi, East Coast 17 Corp., Diana Katunina, A2K NY Corp., Universal Accessibility Inc., Oleksii Antonov, Oceancrest Enterprises Corp., and Kateryna Antonova (collectively, "Count II Defendants"), conspired with each other to violate 18 U.S.C. § 1962(c).

366.    The Count II Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Beach Medical Rehabilitation by means of a pattern of racketeering activity, namely using the U.S. Mail to send fraudulent NF-3 bills and other claim-related documents to Allstate in connection with No-Fault claims, including, without limitation, the numerous instances of mail fraud set forth in Exhibit 1.

367.    For example, a true and accurate image of the medical bill submitted to the Plaintiffs by East Coast 17 Corp for the orthopedic car seat purportedly provided to the claimant T.R. (Claim No. 0777909755) is depicted below.

368. In support of this bill, East Coast 17 Corp submitted additional claim-related documents, including the physician's prescription and the corresponding delivery slip.

369. A true and accurate image of the Delivery Slip for the orthopedic car seat purportedly provided to the claimant T.R. (Claim No. 0777909755) is depicted below.



370.    The purpose of the conspiracy was to obtain No-Fault benefit payments from Allstate on behalf of the DME Entity Defendants, even though the DME Entity Defendants, as a result of the Count II Defendants' unlawful conduct, were not eligible to collect such No-Fault benefit payments. The Count II Defendants were aware of this purpose and agreed to take steps to

meet the conspiracy's objectives, including the creation and mailing of documents and other claim-related materials, including NF-3 forms, containing misrepresentations.

371.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault payments as a result of the Count II Defendants' unlawful conduct described herein.

372.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count II Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the Count II Defendants three times the damages sustained by reason of the claims submitted by the DME Entity Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT III**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**BUSINESS ART INC. ENTERPRISE**
**(Against Andrii Pruskyi)**

373.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-342 as if set forth fully herein.

374.    In furtherance of his operation and management of Business Art Inc. ("Business Art"), the Defendant, Andrii Pruskyi ("Pruskyi"), intentionally prepared and mailed (or caused to be prepared and mailed) false medical documentation in connection with Allstate insurance claims in furtherance of his scheme to defraud.

375.    Pruskyi employed mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 1.

376.    Among other things, NF-3 forms, prescriptions, letters of medical necessity, delivery receipts, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

377.    Policies of insurance were delivered to insureds through the U.S. Mail.

378.    Payments made by Allstate to the Business Art were delivered through the U.S. Mail.

379.    As documented above, Pruskyi repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms to Allstate related to services that were purportedly performed by Business Art for the purpose of collecting payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

380.    As a result of, and in reasonable reliance upon, the mailing of these materially false representations, Allstate, by its agents and employees, issued drafts to Business Art, for the benefit of Pruskyi, that would not otherwise have been paid.

381.    Pruskyi's pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a long period of time, thus enabling Pruskyi to continue without being detected.

382.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

383.    By creating and then mailing to Allstate (or directing the creation and subsequent mailing to Allstate) of numerous fraudulent documents in an ongoing scheme, Pruskyi engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

384.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Business Art for the benefit of Pruskyi.

385.    Allstate is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

386.    Business Art constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

387.    Pruskyi associated with the foregoing enterprise and participated—both directly and indirectly—in the conduct of the Business Art enterprise through a pattern of racketeering activities.

388.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of Pruskyi's conduct.

389.    Pruskyi's conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

390.    By virtue of Pruskyi's violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT IV**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**EAST COAST 17 CORP. ENTERPRISE**
**(Against Diana Katunina)**

391.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-342 as if set forth fully herein.

392.    In furtherance of her operation and management of East Coast 17 Corp. ("East Coast 17"), the Defendant, Diana Katunina ("Katunina"), intentionally prepared and mailed (or

caused to be prepared and mailed) false medical documentation in connection with Allstate insurance claims in furtherance of his scheme to defraud.

393.    Katunina employed mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 1.

394.    Among other things, NF-3 forms, prescriptions, letters of medical necessity, delivery receipts, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

395.    Policies of insurance were delivered to insureds through the U.S. Mail.

396.    Payments made by Allstate to the East Coast 17 were delivered through the U.S. Mail.

397.    As documented above, Katunina repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms to Allstate related to services that were purportedly performed by East Coast 17 for the purpose of collecting payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

398.    As a result of, and in reasonable reliance upon, the mailing of these materially false representations, Allstate, by its agents and employees, issued drafts to East Coast 17, for the benefit of Katunina, that would not otherwise have been paid.

399.    Katunina's pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a long period of time, thus enabling Katunina to continue without being detected.

400.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

401.    By creating and then mailing to Allstate (or directing the creation and subsequent mailing to Allstate) of numerous fraudulent documents in an ongoing scheme, Katunina engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

402.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to East Coast 17 for the benefit of Katunina.

403.    Allstate is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

404.    East Coast 17 constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

405.    Katunina associated with the foregoing enterprise and participated—both directly and indirectly—in the conduct of the East Coast 17 enterprise through a pattern of racketeering activities.

406.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of Katunina's conduct.

407.    Katunina's conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

408.    By virtue of Katunina's violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT V
## VIOLATIONS OF 18 U.S.C. § 1962(c)
## A2K NY CORP. ENTERPRISE
### (Against Oleksii Antonov)

409. Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-342 as if set forth fully herein.

410. In furtherance of his operation and management of A2K NY Corp. ("A2K NY"), the Defendant, Oleksii Antonov ("Antonov"), intentionally prepared and mailed (or caused to be prepared and mailed) false medical documentation in connection with Allstate insurance claims in furtherance of his scheme to defraud.

411. Antonov employed mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 1.

412. Among other things, NF-3 forms, prescriptions, letters of medical necessity, delivery receipts, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

413. Policies of insurance were delivered to insureds through the U.S. Mail.

414. Payments made by Allstate to the A2K NY were delivered through the U.S. Mail.

415. As documented above, Antonov repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms to Allstate related to services that were purportedly performed by A2K NY for the purpose of collecting payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

416. As a result of, and in reasonable reliance upon, the mailing of these materially false representations, Allstate, by its agents and employees, issued drafts to A2K NY, for the benefit of Antonov, that would not otherwise have been paid.

417.    Antonov's pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a long period of time, thus enabling Antonov to continue without being detected.

418.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

419.    By creating and then mailing to Allstate (or directing the creation and subsequent mailing to Allstate) of numerous fraudulent documents in an ongoing scheme, Antonov engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

420.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to A2K NY for the benefit of Antonov.

421.    Allstate is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

422.    A2K NY constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

423.    Antonov associated with the foregoing enterprise and participated—both directly and indirectly—in the conduct of the A2K NY enterprise through a pattern of racketeering activities.

424.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of Antonov's conduct.

425.    Antonov's conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

426.     By virtue of Antonov's violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VI**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**UNIVERSAL ACCESSIBILITY INC. ENTERPRISE**
**(Against Oleksii Antonov)**

427.     Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-342 as if set forth fully herein.

428.     In furtherance of his operation and management of Universal Accessibility Inc. ("Universal Accessibility"), the Defendant, Oleksii Antonov ("Antonov"), intentionally prepared and mailed (or caused to be prepared and mailed) false medical documentation in connection with Allstate insurance claims in furtherance of his scheme to defraud.

429.     Antonov employed mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 1.

430.     Among other things, NF-3 forms, prescriptions, letters of medical necessity, delivery receipts, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

431.     Policies of insurance were delivered to insureds through the U.S. Mail.

432.     Payments made by Allstate to the Universal Accessibility were delivered through the U.S. Mail.

433.     As documented above, Antonov repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms to Allstate related to services that were purportedly performed by

Universal Accessibility for the purpose of collecting payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

434.    As a result of, and in reasonable reliance upon, the mailing of these materially false representations, Allstate, by its agents and employees, issued drafts to Universal Accessibility, for the benefit of Antonov, that would not otherwise have been paid.

435.    Antonov's pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a long period of time, thus enabling Antonov to continue without being detected.

436.    The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

437.    By creating and then mailing to Allstate (or directing the creation and subsequent mailing to Allstate) of numerous fraudulent documents in an ongoing scheme, Antonov engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

438.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Universal Accessibility for the benefit of Antonov.

439.    Allstate is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

440.    Universal Accessibility constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

441.    Antonov associated with the foregoing enterprise and participated—both directly and indirectly—in the conduct of the Universal Accessibility enterprise through a pattern of racketeering activities.

442.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of Antonov's conduct.

443.    Antonov's conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

444.    By virtue of Antonov's violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT VII**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**OCEANCREST ENTERPRISES CORP. ENTERPRISE**
**(Against Kateryna Antonova)**

445.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-342 as if set forth fully herein.

446.    In furtherance of her operation and management of Oceancrest Enterprises Corp. ("Oceancrest Enterprises"), the Defendant, Kateryna Antonova ("Antonova"), intentionally prepared and mailed (or caused to be prepared and mailed) false medical documentation in connection with Allstate insurance claims in furtherance of his scheme to defraud.

447.    Antonova employed mailings to demand and/or receive payment from Allstate on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 1.

448. Among other things, NF-3 forms, prescriptions, letters of medical necessity, delivery receipts, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

449. Policies of insurance were delivered to insureds through the U.S. Mail.

450. Payments made by Allstate to the Oceancrest Enterprises were delivered through the U.S. Mail.

451. As documented above, Antonova repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms to Allstate related to services that were purportedly performed by Oceancrest Enterprises for the purpose of collecting payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

452. As a result of, and in reasonable reliance upon, the mailing of these materially false representations, Allstate, by its agents and employees, issued drafts to Oceancrest Enterprises, for the benefit of Antonova, that would not otherwise have been paid.

453. Antonova's pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a long period of time, thus enabling Antonova to continue without being detected.

454. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

455. By creating and then mailing to Allstate (or directing the creation and subsequent mailing to Allstate) of numerous fraudulent documents in an ongoing scheme, Antonova engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

456.     The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Oceancrest Enterprises for the benefit of Antonova.

457.     Allstate is in the business of writing insurance and paying claims in the State of New York. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

458.     Oceancrest Enterprises constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

459.     Antonova associated with the foregoing enterprise and participated—both directly and indirectly—in the conduct of the Oceancrest Enterprises enterprise through a pattern of racketeering activities.

**COUNT VIII**
**COMMON LAW FRAUD**
**(Against All Defendants)**

460.     Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-342 as if set forth fully herein.

461.     The Defendants, Business Art Inc., Andrii Pruskyi, East Coast 17 Corp., Diana Katunina, A2K NY Corp., Universal Accessibility Inc., Oleksii Antonov, Oceancrest Enterprises Corp., and Kateryna Antonova (collectively, "Count VIII Defendants"), conspired to defraud Allstate by billing for fraudulent DME that was dispensed pursuant to unlawful referrals through Business Art, East Coast 17, A2K NY, Universal Accessibility, and Oceancrest Enterprises.

462.     The Count VIII Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that the DME Entity Defendants were entitled to receive No-Fault reimbursement under New York law.

463.     The Defendants intentionally and knowingly made false and fraudulent statements of material fact to Allstate, and also concealed material facts from Allstate during the course of this scheme and in the course of their submission of bills seeking payment for medical services under New York's No-Fault laws.

464.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (a) in every claim, the representation that Business Art, East Coast 17, A2K NY, Universal Accessibility, and Oceancrest Enterprises were properly licensed and therefore eligible to seek and collect No-Fault benefit payments under Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12) even though the Count VIII Defendants were (a) not properly licensed by the DCWP, and (b) in every claim, the representation that the Count VIII Defendants were eligible to seek and collect No-Fault benefit payments directly from Allstate under Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12) for the durable medical equipment purportedly provided to Allstate claimants when, in fact, the Count VIII Defendants were not eligible to seek or collect No-Fault benefit payments for these services because they were medically unnecessary.

465.     The Defendants intentionally made the above-described false and fraudulent statements, and purposely concealed material facts for the purpose of inducing Allstate to pay charges submitted by (or on behalf of) the Count VIII Defendants.

466.     Allstate reasonably relied, to its detriment, upon the Defendants' material misrepresentations concerning the Count VIII Defendants.

467.     Allstate has been injured in its business and property by reason of the above-described conduct because Allstate has made No-Fault payments to the Count VIII Defendants

76

totaling in excess of $227,375.87 over in connection with No-Fault claims determined to be fraudulent as of the filing of this action.

## COUNT IX
## UNJUST ENRICHMENT
### (Against All Defendants)

468.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-342 as if set forth fully herein.

469.    As detailed above, the Defendants have engaged in improper, unlawful, and unjust acts, all to the harm and detriment of Allstate.

470.    The Count IX Defendants have each been enriched at Allstate's expense through their receipt of payments made by Allstate in connection with No-Fault benefit claims submitted by (or on behalf of) the DME Entity Defendants.

471.    The payments received by the Defendants constituted a benefit that they willingly and voluntarily accepted despite their commission of improper, unlawful, and unjust acts in furtherance of this scheme. The Defendants' retention of Allstate's payments violates fundamental principles of justice, equity and good conscience.

472.    By reason of the improper, unlawful, and unjust conduct described throughout this Complaint, the Defendants have been unjustly enriched in an amount totaling in excess of $227,375.87, the exact amount to be determined at trial.

## COUNT X
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Business Art Inc., East Coast 17 Corp., A2K NY Corp., Universal Accessibility Inc., and Oceancrest Enterprises Corp.)

473.    Allstate re-alleges, re-pleads and incorporates by reference the allegations set forth in paragraphs 1-342 as if set forth fully herein.

474.    Medical providers must adhere to all applicable New York statutes which grant the authority to provide medical services in New York to be eligible to collect assigned No-Fault benefits.

475.    In view of their billing for the unlicensed dispensing of durable medical equipment that were not medically necessary, the DME Entity Defendants have, at all relevant times, been operating in violation of one or more New York or local licensing requirements necessary to provide professional medical services (including, but not limited to, New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus have no standing to seek or collect any No-Fault benefit payments from Allstate, including, but not limited to, No-Fault benefits that were assigned to the DME Entity Defendants by its patients.

476.    The DME Entity Defendants continue to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

477.    The DME Entity Defendants continue to challenge Allstate's prior claim denials.

478.    The DME Entity Defendants continue to commence litigation against Allstate seeking payment of No-Fault benefits allegedly due and owing.

479.    A justifiable controversy exists between Allstate and the DME Entity Defendants because the DME Entity Defendants reject Allstate's ability to deny such claims.

480.    Allstate has no adequate remedy at law.

481.    The DME Entity Defendants will also continue collecting No-Fault payments from Allstate absent a declaration by this Court that their activities are unlawful, and that Allstate has no obligation to pay the pending, previously-denied, and/or any future No-Fault claims submitted by the DME Entity Defendants.

482.    Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 declaring that the DME Entity Defendants, at all relevant times, were (a) unlicensed and (b) unlawfully billing for unnecessary and medically useless DME and thus has no standing to collect payment on any assigned No-Fault claim.

## XI.    DEMAND FOR RELIEF

### COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### BEACH MEDICAL REHABILITATION P.C. ENTERPRISE
**(Against Business Art Inc., Andrii Pruskyi, East Coast 17 Corp., Diana Katunina, A2K NY Corp., Universal Accessibility Inc., Oleksii Antonov, Oceancrest Enterprises Corp., and Kateryna Antonova)**

(a)    AWARD Allstate's actual and consequential damages to be established at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees;

(c)    GRANT injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)    GRANT all other relief this Court deems just.

### COUNT II
### VIOLATION 18 U.S.C. § 1962(d)
### BEACH MEDICAL REHABILITATION P.C. ENTERPRISE
**(Against Business Art Inc., Andrii Pruskyi, East Coast 17 Corp., Diana Katunina, A2K NY Corp., Universal Accessibility Inc., Oleksii Antonov, Oceancrest Enterprises Corp., and Kateryna Antonova)**

(a)    AWARD Allstate's actual and consequential damages to be established at trial;

(b)    AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c)    GRANT injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)    GRANT all other relief this Court deems just.

**COUNT III**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**BUSINESS ART INC. ENTERPRISE**
**(Against Andrii Pruskyi)**

(a)   AWARD Allstate's actual and consequential damages to be established at trial;

(b)   AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees;

(c)   GRANT injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)   GRANT all other relief this Court deems just.

**COUNT IV**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**EAST COAST 17 CORP. ENTERPRISE**
**(Against Diana Katunina)**

(a)   AWARD Allstate's actual and consequential damages to be established at trial;

(b)   AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees;

(c)   GRANT injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)   GRANT all other relief this Court deems just.

**COUNT V**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**A2K NY CORP. ENTERPRISE**
**(Against Oleksii Antonov)**

(a)   AWARD Allstate's actual and consequential damages to be established at trial;

(b)   AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees;

(c)  GRANT injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)  GRANT all other relief this Court deems just.

## COUNT VI
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### UNIVERSAL ACCESSIBILITY INC. ENTERPRISE
### (Against Oleksii Antonov)

(a)  AWARD Allstate's actual and consequential damages to be established at trial;

(b)  AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees;

(c)  GRANT injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)  GRANT all other relief this Court deems just.

## COUNT VII
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### OCEANCREST ENTERPRISES CORP. ENTERPRISE
### (Against Kateryna Antonova)

(a)  AWARD Allstate's actual and consequential damages to be established at trial;

(b)  AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees;

(c)  GRANT injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)  GRANT all other relief this Court deems just.

## COUNT VIII
### COMMON-LAW FRAUD
### (Against All Defendants)

(a)  AWARD Allstate its actual damages in an amount to be determined at trial;

(b)   AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of Defendants' illegal conduct;

(c)   AWARD Allstate its costs in defending collection lawsuits and arbitrations filed by Business Art Inc., East Coast 17 Corp., A2K NY Corp., Universal Accessibility Inc., and Oceancrest Enterprises Corp., seeking to collect payment in connection with false and fraudulent No-Fault claims; and

(d)   GRANT any other relief this Court deems just.

### COUNT IX
### UNJUST ENRICHMENT
### (Against All Defendants)

(a)   AWARD Allstate's actual and consequential damages to be determined at trial;

(b)   GRANT any other relief this Court deems just.

### COUNT X
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Business Art Inc., East Coast 17 Corp., A2K NY Corp., Universal Accessibility Inc., and Oceancrest Enterprises Corp.)

(a)   DECLARE that Business Art Inc., East Coast 17 Corp., A2K NY Corp., Universal Accessibility Inc., and Oceancrest Enterprises Corp., at all relevant times, have been operated in violation of at least one New York state and/or local licensing requirement necessary to provide and bill for healthcare services in New York;

(b)   DECLARE that Business Art Inc., East Coast 17 Corp., A2K NY Corp., Universal Accessibility Inc., and Oceancrest Enterprises Corp.'s activities are unlawful;

(c)   DECLARE that Allstate has no obligation to pay pending, previously-denied and/or future No-Fault insurance claims submitted by Business Art Inc., East Coast 17 Corp., A2K NY Corp., Universal Accessibility Inc., and Oceancrest Enterprises Corp.; and

(d)   GRANT all other relief this Court deems just and appropriate.

## XII.    JURY TRIAL DEMAND

The Plaintiffs demand a trial by jury on all claims.


KING, TILDEN, McETTRICK, & BRINK, P.C.

*/s/ Shauna L. Sullivan*

_____

Nathan A. Tilden (NT0571)
ntilden@ktmpc.com
Shauna L. Sullivan (SS5624)
ssullivan@ktmpc.com
Hugh C. M. Brady (HB4724)
hbrady@ktmpc.com
350 Granite Street, Suite 2204
Braintree, MA 02184
(617) 770-2214 (office)

Attorneys for the Plaintiffs,
*Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Fire & Casualty Insurance Company*

Dated: March 16, 2026